# THE SUPERIOR COURT OF THE STATE OF DELAWARE

BLUE BEACH BUNGALOWS DE, LLC,   :

    Appellant,                   :  C.A. No.: S24A-04-001 CAK

                                        :

      v.                       :

                                        :

THE DELAWARE DEPARTMENT OF   :

JUSTICE CONSUMER PROTECTION   :

UNIT,                                 :

    Appellee.                   :

Submitted: November 13, 2024
Decided: December 4, 2024

**REVISED**

**<u>DECISION ON APPEAL</u>**

*APPEAL GRANTED IN PART
AND DENIED IN PART*

Stephen A. Spence, Esquire, Meluney, Alleman & Spence, LLC, 1143 Savannah Road, Suite 3-A, Lewes, Delaware 19958, Attorney for Appellant.

Brian Canfield, Esquire, Delaware Department of Justice, Consumer Protection Unit, 820 N. French Street, 5th Floor, Wilmington, Delaware 19801, Attorney for Appellee.

**KARSNITZ, RJ**

# BACKGROUND

In 2022, the units of Pine Haven Park included both manufactured homes and recreational vehicle ("RVs"). The latter category included both RVs that were (at some point) mobile, and others that were not. Dale Cohee owned the park for many years. Many of his decisions were motivated by his desire to accommodate the needs of the people in his park. The record is clear on this point. Many of the occupants were long-time friends and many had nowhere else to live. The rent Mr. Cohee charged seems to me to be on the modest end. Undoubtedly Mr. Cohee and those occupying his park trusted each other, so felt no need to document their long-term relationship. No written documents existed in 2022 to establish the rights of the owner or occupants.

This situation created increasingly significant problems. The cheap rent adversely impacted Mr. Cohee's ability to maintain the water and sewer facilities. The bathroom and shower facilities closed after October, and did not start up again until April. Apparently, the facilities were not usable during the colder months. The record does not show what the RV occupants did for water during those periods, but no one doubts that providing living units without water violates numerous Delaware laws.

Appellant is an entity created to buy parks. It owns Jellystone, the park next door to Pine Haven, in Argo's Corner, Sussex County. Appellant decided to purchase, and Mr. Cohee to sell, Pine Haven. Shortly after the purchase, the Delaware Department of Natural Resources and Environmental Control ("DNREC") got involved to monitor the failing septic system. The modest rent or inattention by Mr. Cohee adversely impacted the quality of the system. Appellant as contract purchaser had to determine the status of all the occupants, what law applied to each, and what rights they had. It also had to determine what rent was necessary for proper functioning of the park, and what the law would allow.

In doing so, it is fair to say Appellant used a heavy-handed approach and created significant ill will. In turn, complaints from occupants reached Appellee, the Consumer Protection Unit ("CPU") of the Department of Justice ("DOJ"). Appellee did two things. It issued a Cease-and-Desist Order (the "Order") to Appellant, and it filed a complaint against Appellant alleging violations of the Consumer Fraud Act ("CFA"),[1] the Manufactured Homes and Manufactured Home Communities Act ("MHA"),[2] the Deceptive Trade Practices Act ("DTPA"),[3] and the Order. The DOJ

---

[1] 6 *Del. C.* §§ 2511 *et seq.*
[2] 25 Del. C. §§ 7001 *et seq.*
[3] 6 *Del. C.* §§ 2531 *et seq.*

also appointed one of its own, outside the CPU, as the hearing officer (the "Hearing Officer") to decide the claims.

The parties heavily litigated the case before the Hearing Officer. He ultimately rejected all of Appellant's claims under the DTPA, the award of penalties under the MHA, and some claims of violations of the Order. However, he ruled that the proceeding was constitutional, that Appellant violated the CFA numerous times and awarded administrative penalties totaling $737,500, that Appellant must rebate excess rental payments with interest to some of the residents under the MHA, and that Appellant violated the Order in certain other respects and awarded administrative penalties of $94,000.

Appellant appealed and has raised a myriad of issues. Appellant challenges the scope of the CFA as applied by the Hearing Officer, alleges that certain of the Hearing Officer's findings under the CFA are reversible because they were the product of legal error and were not supported by substantial evidence, alleges that one of the findings that Appellant violated the Order was legal error, and challenges the process on constitutional grounds. My task is to sort out all these issues.

A summary of my decisions is that Appellee substantially, but not totally, overplayed its hand.

**STANDARD OF REVIEW**

This Court's appellate jurisdiction is specified by the act that created the Division of Consumer Protection: "[a]ny party, including the Director, who is aggrieved by the Hearing Officer's final administrative order may appeal the order to Superior Court within 30 days after the date the final order is issued."[4] The substantial evidence standard of review for administrative decisions applies.[5] "Substantial evidence has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[6] "It means more than a scintilla but less than a preponderance of the evidence."[7] The Hearing Officer's legal rulings, however, are entitled to no deference. Rather, I must ensure that the Hearing Officer's decisions are free of legal error. "The Superior Court was required to determine whether the Hearing Officer's decisions were supported by substantial evidence and free from legal error."[8] "When the issue on appeal is whether or not proper legal principles have been applied, this Court's review is *de novo*."[9]

---

[4] 29 *Del. C.* § 2523(d).
[5] *Id.*
[6] *Lehto v. Bd. of Educ. of Caesar Rodney Sch. Dist.*, 962 A.2d 222, 225–26 (Del. 2008) (quotation and citation omitted).
[7] *Noel-Liszkiewicz v. La-Z-Boy*, 68 A.3d 188, 191 (Del. 2013).
[8] *Gala v. Bullock*, 250 A.3d 52, 69 (Del. 2021).
[9] *Johnson Controls, Inc. v. Fields*, 758 A.2d 506, 509 (Del. 2000).

**THE SCOPE OF THE CONSUMER FRAUD ACT**

Appellant helpfully provided a chart showing the Hearing Officer rulings, which rulings Appellant challenges, and a brief description of the nature of the challenge. I am including the chart as an Appendix to this Opinion. Most of Appellant's challenges contest the scope of the CFA and its application to the facts of this case. In short, Appellant contends the CFA applies only to pre-transaction fraudulent statements. Because the statements that Appellee alleged were fraudulent occurred after the (leases or licenses) transactions closed the CFA does not apply, and penalties for post-closing conduct could not be based upon the CFA. Appellant points to five decisions of this Court[10] that held that post-closing statements cannot be a violation of the CFA.

The CFA in its section outlining its scope says:

> The act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, *in connection with* the sale, lease, *receipt*, or advertisement of any merchandise, whether or not any

---

[10] *Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of N. Am., Inc.*, 558 A.2d 1066 (Del. Super. 1989); *Thomas v. Harford Mut. Ins. Co.*, 2003 WL 220511 (Del. Super. Jan. 31, 2003); *Ayers v. Quillen*, 2004 WL 1965866 (Del. Super. June 30, 2004); *Lee ex rel. B.L. v. Picture People, Inc.*, 2012 WL 1415471 (Del. Super. Mar. 19, 2012); *Olga J. Nowak Irrevocable Tr. v. Voya Fin., Inc.*, 2020 WL 7181368 (Del. Super. Nov. 30, 2020).

person has in fact been misled, deceived or damaged thereby, is an unlawful practice.[11] (emphasis supplied)

For me the key language is the italicized language. Upon my first reading, I saw no temporal limitation in the words. In many transactions, the parties raise issues *after* transfer of title or possession. Is the car conforming to its warranties?[12] Are the dogs safe?[13] Were the investments safe and appropriate?[14] Issues arising after the sale, transfer of title, or transfer of possession are ubiquitous, and for me they are "in connection with" the transactions.

Appellee has made three arguments in response to Appellant's contention that the CFA does not apply. First, it contends that leases or licenses for the use of real property, which are, by definition, covered by the CFA, are long term relationships, and therefore different from a traditional one-off sale. As a result, even if there are temporal limitations in the CFA applicable to sales, they do not apply to leases or licenses. That would distinguish this case from the five cases in which this Court made the temporal distinction.

---

[11] 6 *Del. C.* § 2513(a).
[12] *Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of N. Am., Inc.*, *supra*.
[13] *Ayers v. Quillen*, *supra*.
[14] *Olga J. Nowak Irrevocable Tr. v. Voya Fin., Inc.*, *supra*.

Second, Appellee contends that the addition in the CFA of the word "receipt" to the list of the descriptive series of transactions by a 2022 legislative amendment eliminated the temporal limitation.

Third, Appellee asserts that there are new, pre-transaction leases or licenses, which would bring the case within the CFA.

I reject all three of these arguments. Appellee's distinction between leases and licenses, on the one hand, and typical sales transactions on the other, is for me a distinction without a meaningful difference. Each type of transaction often carries obligations beyond the date of transfer of title or possession. The distinction is not expressed in any statutory language, and I reject it.

I also find the 2022 amendment adding "receipt" to the descriptive list of transactions of no help to Appellee's position. The synopsis to the amendment tells us that its purpose was to bring transactions without true consideration, like social media companies funded by advertising, within the ambit of the CFA.[15] In addition, the legal concept of *ejusdem generis* militates against Appellee's position: words grouped together in a list should be viewed similarly and given related meaning.[16]

---

[15] Del. H.B. 91 syn., 151st Gen. Assem. (2021).
[16] *Delaware Board of Nursing v. Gillespie*, 41 A.3d 423 (Del. 2012).

Finally, Appellee's factual argument is unavailing. Appellant created no new leases or licenses, but it spent substantial efforts to terminate existing leases or licenses.

My rejection of Appellee's arguments does not end my inquiry as to the scope of the CFA. I still have lingering doubts as to the initial proposition that the "in connection with" language imposes a temporal limitation to pre-sale conduct. The first case to find a time limitation in the CFA was *Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of N. Am., Inc.*[17] *Gershman's* involved a routine dispute over the performance of a car, and allegations of breach of warranty. Plaintiff contended that, in administering warranty service to the car, the manufacturer made a number of misrepresentations. The Court, with little analysis, found the language of the CFA only applied to pre-sale conduct. The Court used the tautology that there is a time restriction in the statute, because it saw such a restriction in the language of the statute. The case went to the Delaware Supreme Court[18] which, for unascertainable reasons, never discussed the time limitation issue.

Since *Gershman*, a number of Delaware Superior Court cases have adopted the same view as the *Gershman* Court.[19] Again, I discern little analysis to explain

---

[17] 558 A.2d 1066 (Del Super. 1989).
[18] 596 A.2d 1358 (Del. 1991).
[19] *Thomas v. Harford Mut. Ins. Co.*, 2003 WL 220511 (Del. Super. Jan. 31, 2003); *Ayers v. Quillen, supra*; *Lee ex rel. B.L. v. Picture People, Inc., supra*; *Olga J. Nowak Irrevocable Tr. v. Voya Fin., Inc., supra*.

why. Dealing with issues of the proper care of dogs,[20] to proper care of investments accounts,[21] to proper handling of worker's compensation claims,[22] the Superior Court has limited the scope of the CFA to pre-closing conduct. These Courts have done so in interpreting the "in connection with" language, and specifically rejected the statutory directive to interpret the statute to further its consumer benefits.[23] The Courts found the statutory language sufficiently clear so as not to require the statutory directive as to interpretation.[24]

Into this state of affairs came the opinion on state law by Delaware's United States District Court. In *Lowy v. E.I. duPont and Company, Inc.,*[25] the Federal Court addressed a number of claims that DuPont made misrepresentations with regard to certain of its products. In rejecting a motion to dismiss claims pursuant to the Delaware CFA, the Court said:

> In addition, the Court also finds that there is a factual dispute regarding whether or not the statements made by DuPont were "in connection with the sale of

---

[20] *Ayers v. Quillen, supra.*

[21] *Olga J. Nowak Irrevocable Tr. v. Voya Fin., Inc., supra.*

[22] *Thomas v. Harford Mut. Ins. Co., supra.*

[23] "[T]his Court cannot ignore the clear language of the statute which restricts its application to deceptive practices 'in connection with the sale or advertisement' of the merchandise." *Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of N. Am., Inc., supra* at 1074. "Given this statutory limitation, it is clear that post-sale representations which are not connected to the sale or advertisement of the [merchandise] do not constitute consumer fraud under the Act." *Id.; see also Lee ex rel. B.L. v. Picture People, Inc., supra* at *9.

[24] One of these cases also included an appeal to the Delaware Supreme Court in which the issue again remained unaddressed: *Olga J. Nowak Irrevocable Trust v. Voya Financial, Inc.*, 291 A.3d 207 (Del. 2023).

[25] 821 F. Supp. 956 (D. Del. 1993).

merchandise." It seems clear that an after sale statement may be viewed as "in connection with the sale of merchandise." Although such after sale statements may be the exception rather than the rule, the Court concludes that a misrepresentation made after the sale may be found by a trier of fact to be "in connection with the sale."[26]

I agree. "In connection with" seems to me to be a broad mandate, rather than a limiting one. Most transactions have rights and obligations post-closing. Conduct post-closing can be, and here the Hearing Officer determined was, fraudulent. I see no temporal limitations in the statutory language. I find it to be broad and not limiting. To the extent it is ambiguous, I am mindful of the statutory dictate to interpret the statute to achieve its beneficial purpose.

Thus, I reject Appellant's position that the CFA has no application to post-closing conduct. My inquiry now turns to more routine concerns as to whether the Hearing Officer committed legal errors, and whether his decisions were supported by substantial evidence, inquiries which I find are more fruitful for Appellant.

---

[26] *Id.* at 962.

## LEGAL ERRORS AND SUBSTANTIAL EVIDENCE

### Findings Not Charged

Appellant asks me to reverse three (3) of the Hearing Officer's findings of CFA violations, and his issuance of penalties therefor, because those findings were not based on violations charged by Appellee in its Complaint. At its core this is a due process challenge, namely that Appellant was not put on adequate notice of the charges against it and therefore could not adequately prepare and respond at various stages of the administrative proceeding. These three findings relate to a June 30, 2022 letter and a July 18, 2022 letter, both of which predated the September 15, 2022 closing date of the sale of Pine Haven, and the collection of excessive rent payments made by residents over time after the sale of Pine Haven.

#### June 30, 2022 Letter

The Hearing Officer found two CFA violations and imposed a $5,000 penalty ($2,500 each) against Appellant for the delivery of a June 30, 2022 letter to two Pine Haven residents. Although the letter was drafted by Appellant, it was signed on Pine Haven letterhead by Dale Cohee, and delivered to two residents before he thought better of it and stopped delivering the letter. The letter purported to terminate month-to-month rental agreements.

Appellee charged in its Complaint that the letter falsely claimed that Pine Haven was a seasonal community. The Hearing Officer found the letter to be a deceptive communication because Appellant did not yet own Pine Haven and was thus not a party to the lease agreements with these residents, which Appellant knew or should have known, and thus had no right to terminate the lease agreements. However, Appellee did not charge in the Complaint that the letter violated the CFA because Appellant was not yet the owner of Pine Haven when the letter was delivered, nor did Appellee later amend the Complaint to so charge.

**July 18, 2022 Letter**

The Hearing Officer found 25 CFA violations and imposed a $62,500 penalty ($2,500 each) against Appellant for sending a July 18, 2022 letter to 25 Pine Haven residents. The letter purported to revoke Recreational Vehicle ("RV") owners' licenses.

Appellee charged in its Complaint that the letter violated the CFA because it threatened residents with arrest and prosecution by the police, and that their belongings would be confiscated and destroyed, and Appellant subjected the residents to confusing and conflicting notifications and directives. The Hearing Officer found this to be a deceptive communication that violated the CFA because Appellant knew or should have known that it did not yet own Pine Haven and could

13

not revoke the leases (or even guest licenses) with these residents. However, Appellee did not charge that the July 18, 2022 letter violated the CFA because Appellant was not yet the owner of Pine Haven when the letters were sent and did not have authority to revoke the licenses, nor did Appellee later amend its Complaint to so charge.

**Collection of Rent Payments**

The Hearing Officer found 126 CFA violations and imposed a $126,000 penalty ($1,000 each) against Appellant for continuing to accept rent payments in excess of the amount permitted by the Manufactured Housing Act (the "MHA").

Appellee charged in its Complaint that Appellant's written and oral communications to residents violated the CFA by falsely, repeatedly, and willfully claiming that tenants were required to pay an increased monthly rent. In other words, Appellee charged that Appellant violated the CFA through its affirmative representations to residents. The Hearing Officer found that Appellant violated the CFA by omission by continuing to accept, rather than declining, excessive rent payments. However, Appellee did not charge that Appellant violated the CFA by continuing to collect rent payments, nor did Appellee amend its Complaint to so charge.

**Pleading Standard**

Both the CFA[27] and its implementing regulations[28] impose a pleading standard. Appellee may initiate administrative charges for alleged violations, and "[s]uch charges shall provide notice as to the nature of the violation and state the remedies that are sought."[29] The regulations require the complaint to "specify in reasonable detail the conduct alleged to constitute the violation and the statutory provision, rule or regulation the respondent is alleged to be violating or to have violated."[30] The regulations also include a process whereby Appellee has the right to amend its complaint before the filing of a responsive pleading or the hearing; otherwise, Appellee needs leave to amend.[31]

The CFA statute authorizes the Hearing Officer to adjudicate the charges brought by Appellee: "The Attorney General shall appoint a Deputy Attorney General to act as the administrative hearing officer to adjudicate charges brought by the Director of Consumer Protection against any person."[32] Thus, argues Appellant, both by statute and regulation, the Hearing Officer can only find violations and issue penalties based on the charges brought by Appellee, and the Hearing Officer does

---

[27] 29 *Del. C.* §§ 2517 et seq.
[28] 6 *Del. Admin. C.* §§ 103-1.0 et seq.
[29] 29 *Del. C.* § 2523(a).
[30] 6 *Del. Admin. C.* § 103-13.1.
[31] 6 *Del. Admin. C.* § 103-14.1.
[32] 29 *Del. C.* § 2523(d).

not have the legal authority to find violations and issue penalties based on grounds raised by the Hearing Officer *sua sponte*.[33]

Appellant argues that the CFA and its implementing regulations impose a higher pleading standard than the notice pleading standard for typical civil fraud litigation. It requires pleading with specificity both the facts and legal theory of the alleged violation. Having chosen to proceed administratively, without the availability of discovery to Appellant, Appellee must meet this higher standard and be more specific in its allegations than providing mere notice. Otherwise, argues Appellant, it is deprived of an opportunity to mount a full defense on those facts and theories, which would be unfair. Under this heightened pleading standard, the Hearing Officer improperly found violations regarding the two letters and the collection of rent solely on a basis that Appellee did not charge in its Complaint.

Appellee disagrees about the pleading standard, pointing out similarities between the CFA and its regulations and the Superior Court Rules Civil Rules, and argues that the two letters and the collection of rent charges fall within the normal, customary "notice pleading" standard, which was met here.

---

[33] *Office of Comm'r, Delaware Alcoholic Beverage Control v. Appeals Comm'n*, 2013 WL 3816682, at *3 (Del. Super. July 17, 2013) (an administrative body "has no powers other than those conferred upon it by statute by which it was created."); *Jones v. Spence Protective Agency*, 1990 WL 177641, at *3 (Del. Super. Oct. 26, 1990) (same).

**Independent Grounds**

With respect to these three CFA findings by the Hearing Officer, Appellee argues that the findings can be supported on grounds other than those stated by the Hearing Officer, and that I can affirm a ruling on grounds other than those relied upon by the Hearing Officer.[34]

Appellant argues that these two cases relied on by Appellee are distinguishable. In those cases, the Delaware Supreme Court was considering appeals of trial court decisions granting summary judgment. Since the Supreme Court reviews a trial court's grant of summary judgment *de novo*, it performed its own independent review of the entire record to assess whether the summary judgment standard was met and it was therefore free to affirm on other grounds.[35] Here, however, I am engaged in a "substantial evidence" review of an administrative decision, not a *de novo* review of the factual record in a summary judgment case (see "Standard of Review," above, and "Substantial Evidence," below). Under the terms of the CFA statute itself, I am limited to reviewing whether the Hearing Officer's *findings as stated in his Decision* are supported by substantial evidence, and I am not permitted to make my own factual findings.[36] The settled case law standard of

---

[34] *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 334 (Del. 2012); *Windom v. William C. Ungerer, W.C.*, 903 A.2d 276, 281 (Del. 2006).
[35] *DaBaldo v. URS Energy & Const.*, 85 A.3d 73, 77 (Del. 2014).
[36] 29 *Del. C.* § 2523(d).

review of an administrative decision confirms my limited role: "The appellate court does not weigh the evidence, determine questions of credibility, or makes its own factual findings."[37] Moreover, Appellee's independent grounds for affirmance are claims that the Hearing Officer rejected, and that Appellee has not cross-appealed.[38]

A brief summary of the "independent grounds" asserted by Appellee follows.

The June 30th letter, which was sent to the RV residents of the community, told the RV residents that they were subject to the Landlord-Tenant Code and would be considered holdover tenants, liable for double rent. However, the Landlord-Tenant Code does not apply to RV owners renting a plot of land. These false threats constituted an independent violation of the CFA.

The July 18th letter violated the CFA for three independent reasons: (1) Appellant told residents they had a license running from April 15 to October 31, when they lived there year-round, (2) Appellant made false threats to the residents that the police would remove them from their homes and arrest and prosecute them, and that their belongings would be confiscated and destroyed, and (3) two of the

---

[37] *Falconi v. 14 Coombs & Coombs, Inc.*, 902 A.2d 1094, 1098 (Del. 2006).
[38] *Ivory v. Ivory*, 69 A.3d 371 (Del. 2013) ("A cross-appeal is necessary if the appellee seeks affirmative relief from a portion of the judgment, i.e., enlarging the appellees' own rights or lessening the rights of an adversary.").

residents receiving the letter qualified as manufactured homeowners, and thus did not have license agreements.[39]

With respect to the collection of rents, implicit in Appellee's charge that Appellant "falsely claimed, repeatedly and willfully, that tenants were required to pay an increased monthly rent" is that Appellant continued to charge and collect such illegal rent. Since it was difficult for Appellee to determine exactly when and whether the repeated charging of illegal rent came from affirmative misrepresentations or omissions, it effectively charged both.

As Appellant points out, the Hearing Officer acknowledged correctly that he could not award administrative penalties against Appellant for MHA violations, but only a rent rebate. However, the Hearing Officer has separate authority under the CFA not only to award an administrative penalty against Appellant but also to craft "an order of restitution, rescission, recoupment, or other relief appropriate to prevent Appellant from being unjustly enriched."[40] Thus, in my view, the Hearing Officer did not "recharacterize" the conduct as violating the CFA so that he could impose three penalties on Appellant for the same conduct. Rather, he properly ordered

---

[39] Pursuant to 25 *Del. C.* § 7024(b)(1), if a landlord of a manufactured home community wants to terminate a rental agreement or refuse to renew one because of a change in use of the land, it must give one year notice to manufactured homeowners.

[40] *See* fn 42, below.

administrative penalties under the CFA, a rent rebate under the MHA, and a violation of the Order.[41]

**Equitable Ownership**

With respect to the June 30, 2022 and July 18, 2022 letters, Appellant further argues that, since the property was under a contract of sale at the time of these two letters, its status as an equitable owner of the property gave it the right to send the letters, even if it did not yet hold legal title. Under Delaware law, a party under contract to purchase real estate is the equitable owner of the property and has substantial rights in the property.[42] "Under Delaware law, when a contract for real property is executed, the seller transfers the equitable interest in the property to the prospective buyer and the seller retains a legal interest, the right to obtain money from the sale of the property, but not the rights in the property itself."[43] Appellant argues that its rights as a purchaser/equitable owner include advancing legal positions related to the property, so it had the right to work with Mr. Cohee to take

---

[41] *State Dep't of Labor-Div. of Unemployment Ins. v. Pasquale*, 2015 WL 5461540, at *4 (Del. Super. Ct. Sept. 17, 2015). The text of 29 *Del. C.* § 2524(b) makes clear that a hearing officer is authorized to award such relief, as it allows for "an administrative penalty up to $5000 per violation, a cease and desist order, *and* an order of restitution, rescission, recoupment, or other relief appropriate to prevent violators from being unjustly enriched." (emphasis added)

[42] *Lawyers Title Ins. Corp. v. Wolhar & Gill, P.A.*, 575 A.2d 1148, 1153 (Del. 1990).

[43] *Protect Our Indian River 25 v. Sussex Cnty. Bd. of Adjustment*, 2015 WL 4498971, at *10 (Del. Super. July 2, 2015), aff'd, 133 A.3d 981 (Del. 2016).

steps during the contract period to prepare the community for transfer, and to take formal actions affecting the community and its residents.

Appellee argues that this overstates the rights of an equitable owner. Our Supreme Court has held that an equitable owner does not have the right to exclude individuals from the property, holding that "mere equitable title will not support an action for ejectment."[44] Since ejectment is analogous to Appellant's threatened actions, in that the letters sought to remove people from the property, Appellant's equitable ownership did not make such communications lawful. The issue is not whether an equitable owner can be considered an owner, but whether an equitable owner has the legal authority to revoke a guest license or terminate a lease agreement, which it does not.

**June 30, 2022 and July 18, 2022 Letters**

With respect to the June 30, 2022 and July 18, 2022 letters, I agree with Appellant that the grounds for a violation of the CFA stated in Appellee's Complaint and the grounds stated in the Hearing Officer's Decision for a violation of the CFA and resulting penalties are different. However, I need not address as a matter of law whether the CFA imposes a higher pleading standard in CFA administrative

---

[44] *Burris v. Wilmington Tr. Co.*, 301 A.2d 277, 279 (Del. 1972).

proceedings than in civil litigation, since I decide the propriety of the Hearing Officer's findings on other grounds, below.

Nor will I rely on other, independent facts in the record to support the Hearing Officer's findings. To me, the language of the CFA statute dictates that my review is of the findings the Hearing Officer stated in the Decision, and not the findings Appellee wishes the Hearing Officer had made. And the settled standard for Superior Court review of an administrative decisions is my guidepost and confirms my limited role.

The findings in both letters were that, because Appellant did not yet own Pine Haven and was thus not a party to the lease agreements with these residents, Appellant had no right to terminate the lease agreements. I find below that, as a matter of law, Appellant did have that right. As equitable owner of the property when the letters were delivered, in my view Appellant had the right under Delaware law to take steps during the contract period to prepare the community for transfer, and to take formal actions affecting the community and its residents. This includes the communications in the two letters. In my view, Delaware law does not make it unlawful for Appellant as equitable owner to communicate its *future* intentions as legal owner. The July 18, 2022 letter stated a deadline of October 31, 2022 for residents to leave, and Appellant became the legal title holder of the park on

September 15, 2022. Thus, Appellant would have had the right as legal owner of the property to file an ejectment action on that later date.

Thus, I find that the Hearing Officer's findings with respect to these two letters were not based on violations charged by Appellee in its Complaint.

**Collection of Rent Payments**

Similarly, in my view, the Hearing Officer based his finding of a CFA violation, and his ordered rebate of the illegal portion of those rent payments, on Appellant's *omission* by accepting, rather than declining, excessive rent payments, rather than on Appellee's charge of Appellant's *commission* by claiming that tenants were required to pay excessive rent payments. Thus, I find that the Hearing Officer's findings with respect to the collection of rents were based on violations not charged by Appellee in its Complaint.

However, I do not find that Appellee "piled on" three penalties for the same conduct under the CFA, the MHA, and the Order. Put another way, Appellee had the independent right under each of the CFA, the MHA, and the Order to award the penalties that it did.

**Substantial Evidence**

As discussed above under "Standard of Review," I must be satisfied that there is substantial evidence in the record to support the Hearing Officer's findings, while

deferring to the Hearing Officer's factual findings and not reaching my own. Appellant asks me to reverse four (4) of the Hearing Officer's findings of CFA violations, and his issuance of penalties therefor, because those findings were not supported by substantial evidence: the June 30, 2022 and July 18, 2022 letters, the February 23, 2023 "Dear RV Residents" letter, and the Collection of Rents.

**June 30, 2022 and July 18, 2022 Letters**

The Hearing Officer ruled that Appellant's June 30, 2022 and July 18, 2022 letters violated the CFA. As discussed above, the Hearing Officer found that both letters violated the CFA because Appellant did not own Pine Haven when the letters were delivered or sent, and Appellant was not a party to the lease or license and therefore could not terminate or revoke it, respectively.

As I held above, the Hearing Officer committed legal error because Delaware law gives the right to Appellant as equitable owner of the park to communicate its future intentions as legal owner to the residents.

Appellant further argues that the Hearing Officer's findings were not supported by substantial evidence. The June 30, 2022 letter was on "Pine Haven Campground" letterhead, which was the name of Mr. Cohee's LLC that was the record owner of the community on the date of the letter. The letter was signed by Mr. Cohee, who delivered the letter himself. To me, this evidence undercuts the

24

Hearing Officer's finding that the letter was false or deceptive as to who was delivering it or who was purporting to revoke the leases. Regarding the July 18, 2022 letter, it stated in the first sentence that it was being sent by "the incoming buyers of" Pine Haven. To me, this letter was not false or deceptive as to who was delivering it or who was purporting to revoke the licenses: it was Appellant's affiliate, the disclosed "incoming buyers."

Thus, I find that that there was not substantial evidence to support the Hearing Officer's findings with respect to these two letters.

**The February 23, 2023 "Dear RV Residents" Letter**

The Hearing Officer found 24 CFA violations and imposed a $84,000 penalty ($3,500 each) against Appellant for sending a February 23, 2023 "Dear RV Residents" letter (the "Dear RV Letter"). The Hearing Officer found that the Dear RV Letter was sent to 24 residents and violated the CFA because it falsely asserted that Pine Haven was a seasonal campground.

Appellant argues that I should reverse for three reasons. First, it argues that the letter did not assert Pine Haven was a seasonal campground. Rather, it asserted that Pine Haven was not a year-round facility. Nonetheless, the Hearing Officer sanctioned Appellant for including a specific phrase that is not actually in the letter.

Second, Appellant argues that the letter's statement that Pine Haven is not a year-round facility was not false as to the recipients of the letter. For the 24 residents who received the Dear RV Letter, the campground was not year-round as to them. For RV site users, the park was not meant for year-round use. The Division of Public Health permits before and after Appellant became owner authorized the park to be run as a recreation camp from April to October. As Mr. Cohee explained, "the camping part was supposed to be all seasonal," and he closed the bath houses in October because of freezing concerns and reopened them in April. Similarly, the letter stated that "the Campground Season runs from April 15 to October 31. Services terminated shortly after October 31, 2022. Specifically, the bath house was shut down for the off-season."

Third, although the 24 Pine Haven residents who received the Dear RV Letter may have lived in an RV year-round, they did not have the legal right to remain at Pine Haven after the RV season ended because their vehicles were not found to be immobile as defined by statute. Accordingly, saying to those residents that Pine Haven was not a year-round facility was not false.

Appellant faults the Hearing Officer for grouping the residents of Pine Haven into two categories rather than three categories. The Hearing Officer grouped the

residents into two categories: residents who lived in manufactured homes,[45] and residents who lived in RVs. The Hearing Officer found that there were 29 manufactured homes residents, and Appellant is not appealing that finding. However, Appellant argues that the RV residents should be further divided into two sub-categories: those whose RVs were immobile and those whose RVs were mobile. Residents who lived in immobile RVs were covered by the MHA, and those who lived in mobile ones were not covered by the MHA.[46] The RV residents' property rights depend on the characteristics of the vehicle in which they are living.

An RV is considered a manufactured home subject to the MHA if all of the following are true: (1) it is located in a manufactured home community, (2) the RV is the primary residence of the tenant; and (3) at the time the current tenant obtained title to the vehicle it was not mobile and could not reasonably be returned to a condition where it would be mobile."[47] Yet the Hearing Officer did not rule whether the 24 RVs were manufactured homes covered by the MHA; i.e., whether they were mobile or immobile. Appellant stated that it had attempted to send the Dear RV Letter only to those considered mobile RV owners. There is no evidence on the record that an immobile RV owner received the Dear RV Letter.

---

[45] 25 *Del. C.* § 7003(12)a.
[46] 25 *Del. C.* § 7004.
[47] 25 *Del. C.* § 7003(12)b.

Therefore, argues Appellant, all 24 residents who received the Dear RV letter had no legal right to reside in the community after the season ended because they were not legally considered to be living in manufactured homes. As a result, Appellant's representation in the Dear RV Letter sent to those mobile RV residents that the community was seasonal (or not a year-round facility) was not false.

Appellee counters that the Hearing Officer's statement was accurate. While the Dear RV Letter did not use the term seasonal campground, it stated that Pine Haven was not a year-round facility, and that the campground season runs from April 15 to October 31. Taken together, these statements are the functional equivalent of the Hearing Officer's characterization in the Dear RV Letter.

Moreover, argues Appellee, the Dear RV Letter contains no qualifier specifying that the campground is considered year-round for those living in a manufactured home or in an immobile RV but considered seasonal for those living in a mobile RV. Even if no mobile RV residents had been living at Pine Haven year-round, this failure would have been false and deceptive. In fact, the record shows that many mobile residents were living there full time. Mr. Cohee stated that "I had older people on disability or Social Security who were living there year-round when I sold it." Further testimony supports this and shows that Pine Haven had full time mobile RV residents. In addition, resident Joy Kaiser received the Dear RV Letter even though her RV qualified as a manufactured home, and thus the misleading

28

nature of the letter is amplified in her case. Appellant was not making distinctions between manufactured homes, immobile RVs and mobile RVs at the time the Dear RV Letter was sent, as it had told the manufactured homeowners that Pine Haven was a seasonal campground in a letter dated the same day.

I find that Pine Haven had year-round manufactured home residents, year-round immobile RV residents and mobile RV residents. As to the year-round manufactured home residents and the year-round immobile RV residents (including Joy Kaiser), I find that the Dear RV Letter was a misrepresentation in violation of the CFA. As to the 23 remaining mobile RV residents, I do not find substantial evidence to support the Hearing Officer's findings that there was a misrepresentation in violation of the CFA.

**Collection of Rents**

As discussed above, the Hearing Officer found 126 CFA violations and imposed a $126,000 penalty ($1,000 each) against Appellant for continuing to accept rent payments above the amount permitted by the MHA after Appellee gave notice of the impropriety of the increase. The Hearing Officer found that by seeking these impermissible rent increases and failing to correct residents who continued to pay excess rent at least 126 times, Appellant violated the CFA.

As discussed above, Appellant argues that the Hearing Officer's ruling was an *ultra vires* end run around the General Assembly's limitation on his authority to impose administrative penalties under the MHA by imposing administrative penalties under the CFA for the same conduct (the rent rebate). Appellant argues that the Hearing Officer "recategorized" MHA violations as CFA violations in order to impose duplicative administrative penalties.[48] I rejected this argument, above.

Appellant further argues that the Hearing Officer's ruling is not supported by substantial evidence. The only evidence of communications to manufactured home residents about the increase in rent is limited to the September 15, 2022 "Hello" Letter (the Hearing Officer's findings on which Appellant is not appealing). The meager testimony on this issue confirmed that the manufactured residents' understanding of the rent amount due was based solely on that letter. By contrast, except for the September 15, 2022 "Hello" Letter directing that monthly rent payments be submitted to the Jellystone office next door, there is no evidence about the circumstances surrounding the monthly payments. Therefore, there is no evidence that Appellant interacted with a resident each time (or any time) a rent check was dropped off. So, there is no evidence of any communication with residents when they submitted their monthly rent payments that could be found to be false or

---

[48] As discussed above, Appellant also argues that Appellee piled on for a third time in awarding penalties for a violation of the Cease and Desist Order in connection with this same conduct.

misleading under the CFA. There is no factual basis to find a CFA violation here, let alone 126 separate CFA violations.

Thus, I find that that there was not substantial evidence to support the Hearing Officer's findings with respect to the collection of rents.

## CEASE AND DESIST ORDER

The Hearing Officer found that Appellant violated the Order's prohibition of threatening the residents with illegal rent increases 27 times by collecting raised rents and imposed a $54,000 penalty against Appellant ($2,000 each).

On April 3, 2023, the same day Appellee filed its Complaint, its director issued the Order, which stated in pertinent part:

> [Appellant] is hereby ORDERED to cease and desist from engaging in the following conduct in violation of Delaware law:
>
> • Making any false or misleading communications to residents/tenants of Pine Haven Campground, including but not limited to: … (4) threatening the residents with illegal rent increases.
>
> • Threatening or attempting to evict tenants / residents, or raise their rent, in violation of Chapter 70.

Under 29 *Del. C.* §2524(b):

> [A]ny willful violation of … a lawful cease and desist order may be sanctioned by an administrative penalty up to $5,000 per violation…

31

Under Delaware law, imposing penalties for violating an order is permitted only if the order gave clear notice of what conduct was proscribed and the conduct meaningfully violated the precise prohibition. "When an asserted violation of a court order is the basis for contempt, the party to be sanctioned must be bound by the order, have clear notice of it, and nevertheless violate it in a meaningful way."[49] "A cardinal requirement for any adjudication of contempt is that the order allegedly violated give clear notice of the conduct being proscribed."[50] The movant has the burden of proof to establish contemptuous conduct by a preponderance of the evidence.[51] Determining what conduct the Order's provisions prohibited is a legal issue reviewed *de novo*.[52]

Both provisions of the Order lead with the word "threatening," and the second provision added the word "attempting." The import of the Order's terms is that Appellant was prohibited from communicating to a resident that Appellant was going to raise, or attempt to raise, their rent in an illegal way.

---

[49] *TransPerfect Glob. v. Pincus*, 278 A.3d 630, 644 (Del. 2022) (reversing in part a contempt order).
[50] *Mother African Union First Colored Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, 1992 WL 83518, at *9 (Del. Ch. Apr. 22, 1992), aff'd, 633 A.2d 369 (Del. 1993) (ruling that filing an action in another court was not proscribed by the terms of the court's order).
[51] *Pincus*, 278 A.3d at 644.
[52] *See Pincus* at 645 ("Our review of claimed errors of law—including the application of the legal standard for contempt—is *de novo*.").

It is undisputed that, from April 3, 2023, when the Order was issued, until the record was closed in September 2023, Appellant did not threaten or attempt to raise the residents' rent (illegally or otherwise). In October 2022, Appellant raised the monthly rent being charged to the manufactured home owners from $350 to $450. Appellant's letters for past due rent were sent in March 2023, before the Order was issued. The limited evidence of Appellant's communications with residents about the rent showed that those communications occurred, at the latest, by the end of March 2023. There is no evidence that, after the Order was issued, Appellant communicated with any of the residents about rent.

The Hearing Officer based his contempt finding solely on Appellant's acceptance of rent payments, which was conduct that was not proscribed by the Order. The Hearing Officer did not cite any evidence of Appellant communicating with residents about raising their rent after the Order was issued (because there was none). Instead, the Hearing Officer's only findings supporting his ruling were as follows: "[Appellant] continued to accept rental payments in excess of that permitted by the MHA, without either notifying tenants of the overpayment or rebating the overpayments as required by the MHA." From there, he concluded "[t]his occurred either through false or misleading communications seeking excess rental payments, or through material omissions by [Appellant] failing to notify tenants that they were paying in excess of the permissible amount." He then ruled "this conduct is directly

in violation of the Summary Cease and Desist Order's prohibition on 'any false or misleading communications … threatening the residents with illegal rent increases. [Or] [t]hreatening or attempting to … raise their rent, in violation of Chapter 70.'"

Appellant argues that the Hearing Officer erred in at least three ways. First, the Order did not prohibit Appellant from continuing to accept rental payments, nor did it mandate that Appellant notify residents of overpayment or to provide a rebate. The Order only prohibited Appellant from "threatening" residents with illegal rent increases, a specific action, and there was no evidence Appellant took that action.

Second, the Hearing Officer found that Appellant may have made "false or misleading communications seeking excess rental payments," but he cited no evidence to support that, and there was no such evidence to support that finding.

Third, he ruled that this conduct was "directly in violation" of the Order, but the Order did not prohibit accepting rent payments, nor did it mandate that Appellant take affirmative steps to notify residents of overpayment. At most, the Order was ambiguous on whether that conduct was prohibited or required, and an ambiguous order does not provide the required "clear notice" to support a violation finding.[53]

---

[53] *See In re TransPerfect Glob.*, *supra* at *19, aff'd sub nom. *Pincus*, 278 A.3d 630 ("Here, it is ambiguous what the phrase 'monthly basis' was intended to mean. Thus, the Custodian was not provided 'clear notice' that he was required to file fee petitions each month for the prior month and cannot be held in contempt for failing to do so.").

In summary, the Order prohibited Appellant from "threatening" residents with illegal rent increases. There was no evidence Appellant did that after the Order was issued. Yet, the Hearing Officer found 27 violations of the Order and issued a $54,000 penalty because Appellant continued to accept rent payments and did not take affirmative steps to notify residents of possible overpayment or provide rebates. The Order did not give "clear notice" that such conduct was prohibited or required.

Appellee argues that Appellant's interpretation of the Order ignores the threats inherent in a landlord-tenant relationship. Tenants know that if they do not pay the rent that they are told to pay that they could face eviction. By not rescinding the rent increases, Appellant was in effect "threatening" residents with the illegal rent increases, even if no explicit threatening communications were made.

I find Appellee's argument unavailing and agree with Appellant that there was not substantial evidence to support the Hearing Officer's findings with respect to the violation of the Order.

## CONSTITUTIONALITY OF THE CONSUMER FRAUD ACT

The United States Supreme Court recently decided a case in which it addressed the issue of the Seventh Amendment to United States Constitution's right to jury trial in what otherwise would be an administrative process.[54] The parties

---

[54] *SEC v. Jarkesy*, 144 S. Ct. 2117 (June 27, 2024).

agree the Supreme Court has never applied the Seventh Amendment to the States. Nonetheless, Appellant offers the *Jarkesy* analysis to me as an analogous analytical framework within which to address the question of whether the claims made here require a jury's consideration pursuant to the Delaware State Constitution's civil jury trial mandate.[55]

Article I, Section 4 of the Delaware Constitution states: "Trial by jury shall be as heretofore." Delaware courts "have always construed that provision in the Delaware Constitution as guaranteeing the right to trial by jury as it existed at common law."[56] Case law precedent and a reading of the text itself require me to review the legal history to determine whether the nature of the action, or the remedy sought, were tried to a jury when the writers of the Delaware Constitution reaffirmed the right to trial by jury in 1897.

Appellee bases its claims against Appellant on allegations of fraud and seeks monetary penalties. Typical fraud claims are routinely litigated in Superior Court and parties to such claims have a right to a trial by jury. But the fraud claims here have significant differences from routine civil, common law fraud claims. The differences include the following requirements, which are part of the routine fraud case, but not part of the civil enforcement action: (1) *scienter*, (2) intent to induce

---

[55] *See* Article I, Section 4 of the various versions of the Delaware Constitution.
[56] *Claudio v. State*, 585 A.2d 1278, 1298 (Del. 1991).

action, (3) plaintiff's reliance on the fraudulent conduct, and (4) appropriate damages. In addition, the plaintiff/prosecuting party here is the State, the remedies are far more encompassing, and the Statute of Limitations is five years, not three.[57] In short, the administrative process here, authorized by our State Legislature, is significantly different than the ordinary civil fraud case.

Our State Legislature determined to create a pathway to address largely business fraud perpetrated upon consumers. It gave the State Department of Justice significant powers to do so. It did not address or provide for a right to trial to a jury. On its face and substance, the law utilized here is much different than common law fraud as it existed in 1897.

Of course, the State Legislature cannot override Constitutional guarantees. But the law and process the Legislature created is, for me, far different than anything that existed in 1897. Our Courts have addressed the issue in a number of cases. For example, this Court has held that a summary possession proceeding was unconstitutional, finding the proceeding analysis to an ejectment action well known at common law.[58]

The CFA scheme was, in my opinion, not known at common law. It is significantly different than common law fraud. It has salutary purposes very

---

[57] 6 *Del. C.* § 2506; *State ex rel. Brady v. Pettinaro Enterprises*, 870 A.2d 513, 526 (Del. Ch. 2005).
[58] *Hopkins v. Justice of Peace Court No. 1,* 342 A.2d 243 (Del. Super. 1975).

different than common law fraud. While a gray area exists, I am of the view the process is constitutional.

## CONCLUSION

For the reasons discussed above, I reverse the Hearing Officer's findings, and vacate the attendant penalties, with respect to the following:

| | |
|---|---|
| CFA - June 30, 2022 Letter | $ 5,000 |
| CFA - July 18, 2022 Letter | $ 62,500 |
| CFA - February 23, 2023 "Dear RV Residents" Letter | $ 84,000 |
| CFA - Collection of Rent Payments | $126,000 |
| Cease and Desist Order – Accepting Rent Payments | $ 54,000 |
| | $331,500 |

For the reasons discussed above, I affirm the Hearing Officer's findings, and the attendant penalties, with respect to the following:

| | |
|---|---|
| CFA - August/September, 2022 Lot Licenses | $ 72,500 |
| CFA – September 15, 2022 "Hello!" Letter | $ 72,500 |
| CFA - February 23, 2023 Change of Use Notice | $ 84,000 |
| CFA - March 7, 2023 Letter | $130,500 |
| CFA - Settlement Agreements/Stipulated Agreements | $ 55,000 |
| CDO – Brown/Freudenthal (Seasonal) | $ 10,000 |
| CDO – Rollman (Seasonal) | $ 5,000 |
| CDO – Brown/Freudenthal (Eviction) | $ 15,000 |
| CDO – CDO – Bowles (Eviction) | $ 5,000 |
| CDO – Bowles (Good Faith Requirement) | $ 5,000 |
| | $454,500 |

The Appeal is **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED**.

/s/ Craig A. Karsnitz
Criag A. Karsnitz

cc:    Prothonotary

# APPENDIX

## CONSUMER FRAUD ACT VIOLATIONS

| Basis for Violation | Decision | Violations | Penalty | Appeal | Basis |
|---|---|---|---|---|---|
| June 30, 2022 Ltr. (Ex. 4) | p. 53 | 2 | $5,000 | Y | CFA Scope (Scope); Not Charged (NC); Substantial Evidence (SE) |
| July 18, 2022 Ltr. (Ex. 1) | pp. 53-54 | 25 | $62,500 | Y | Scope, NC, SE |
| Aug. & Sept. 2022 Seasonal Lot Licenses | pp. 54-55 | 29 | $72,500 | N | N/a |
| Sept. 15, 2022 "Hello!" Ltr. | p. 55 | 29 | $72,500 | N | N/a |
| Feb. 23, 2023 Change Of Use Notice (Exhs. 15, 32) | pp. 56-57 | 37 | $129,500 | Y | Scope |
| Feb. 23, 2023 "Dear RV Residents" Ltr. (Ex. 20) | pp. 57-58 | 24 | $84,000 | Y | Scope, SE |
| March 7, 2023 Ltr. (Ex. 24) | pp. 58-59 | 29 | $130,500 | Y | Scope |
| Settlement Agreements and Stipulated Agreements (Exhs. 22, 23) | pp. 59-60 | 11 | $55,000 | Y | Scope |
| Failure to Correct Residents regarding Rent Payments | pp. 60-61 | 61 | $126,000 | Y | NC, not actionable under CFA, SE |

## CEASE AND DESIST ORDER VIOLATIONS

| Violation | Decision Pg. | Violations | Penalty | Appeal |
|---|---|---|---|---|
| Cease & Desist Order- Brown and Freudenthal (Seasonal) | 81-82 | 2 | $10,000 | N |
| Cease & Desist Order- Rollman (Seasonal) | 82 | 1 | $5,000 | N |
| Cease & Desist Order- Brown and Freudenthal (Eviction) | 83 | 3 | $15,000 | N |
| Cease & Desist Order- Bowles (Eviction) | 84 | 1 | $5,000 | N |
| Cease & Desist Order- Accepting Rent Payments | 84-86 | 27 | $54,000 | Y |
| Cease & Desist Order- Bowles (Good Faith Requirements) | 86-87 | 1 | $5,000 | N |